IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Per-Co, Ltd., et al.,                                                 Case No. 3:06CV00979

           Plaintiff

           v.                                                   ORDER

Great Lakes Factors, Inc., et al.,

           Defendant

           This suit for declaratory and other relief involves conflicting claims to the assets of Great Lake Factors, Inc. [Factors], a factoring business presently in bankruptcy. The principal parties to the dispute are the RFC Banking Company, which is a successor to the Peoples Banking Company [jointly, the "bank"], and entities owned or controlled by James Perry [Perry].

           The dispositive issues are: 1) whether Factors obtained all or substantially all of the assets of Great Lakes Funding, Inc. [Funding], also a factoring business, to which the bank had extended a secured line of credit, and 2) if so, whether Factors is a successor to Funding, so that the bank's secured interest in Funding's assets attaches to Factors' assets. Perry claims to be an unsecured creditor of Factors.

           If the bank prevails on its claim that Factors is a successor to Funding, then the bank's status as a secured creditor of Funding will give the bank priority over Perry, an unsecured creditor, in Factors' bankruptcy.

           Following a nonjury trial, filing of post-trial briefs, and oral argument, the case is decisional.

For the reasons that follow, I find that Factors: 1) acquired substantially all the assets of Funding; and 2) is a successor to Funding. The bank, accordingly, has a secured interest in the assets of Factors.

**Background**

Thomas Bielski [Thomas] and Jeffrey Bielski [Jeffrey] are, respectively, father and son. Together they run a factoring business. Factoring companies provide financing to their customers, who, as a result of their credit ratings, might otherwise be unable to obtain the cash flow needed to run their own businesses.

The factor pays its customers a percentage of the face value of the customers' accounts receivable. In exchange for this cash, the customers assign to the factor their rights to those accounts receivable. The third parties who owe money on the accounts receivable ("invoice debtors") make payments directly to the factor instead of the creditor (the factor's customer) listed on the invoice. After the factor receives full payment of an invoice, the customer receives whatever amount remains (if any) minus interest and a factor's fee. By selling its invoices at a discount, a factor's customer receives cash immediately: it does not have to wait for the invoice debtors to pay the invoices.

For factoring to work, a factoring company needs funds to pay its customers for the invoices.

In this instance, the bank, beginning sometime in 1998 or 1999, made funds available to the Bielskis. Through a Loan and Security Agreement [Loan Agreement] dated February 21, 2001, the bank extended a $3.5 million line of credit to Funding, secured by an interest in all of Funding's accounts, accounts receivable, inventory, general intangibles, and proceeds. Both Jeffrey and Thomas personally guaranteed the bank's extension of credit to Funding.

The Bielskis used the money from the bank to buy invoices from their customers. The Loan Agreement required the Bielskis to instruct the invoice debtors to send their payments to a lockbox – a post office box to which the bank had sole access. As the payments came into the lockbox, the bank would be repaid for the monies it provided to Funding under the Loan Agreement. At this point, the flow of cash from the bank to Funding, from Funding to Funding's customers, and from the invoice debtors to the bank (via the lockbox) would be complete.

The circulation of that flow depends, ultimately, on the ability and willingness of the invoice debtors to pay their bills. If they do not do so, money doesn't go into the lockbox. If, in the meantime, the factor has continued to use the line of credit to buy more invoices, the line of credit may eventually become exhausted.

That occurred in early 2002: Funding was, as Thomas told Perry, whom Thomas met at an investment seminar, "maxed out" on its line of credit with the bank. Though cash was coming in from some of the invoices, others were over-aged [i.e., several months delinquent], and were thus unlikely to be paid.

This was not the first time in the course of its existence that the Bielskis' business had had credit problems. When Thomas started the factoring business in 1989, he operated it as a sole proprietorship. By 1992, because, for reasons not explained at trial, Thomas could not get credit in his own name, he incorporated Funding and issued 100% of its shares to Jeffrey.

By the Spring of 2002, the bank had notified Funding that the bank would not extend to Funding any additional credit. By this time, Thomas and Perry had met, and Perry had expressed an interest in lending money to the Bielskis at a 20% interest rate.

Perry did not want his loan to the Bielskis to be to be subordinate to the bank's line of credit to Funding, which was secured by an interest in nearly everything Funding owned. To satisfy Perry that his loan would be repaid, the Bielskis decided to form another corporation. This led to the incorporation of Factors as an LLC on May 22, 2002.

Shortly thereafter, the Bielskis learned that the LLC form would not accomplish the fundamental objective of preventing Perry's loan from being subordinate to that of the bank. On consultation with counsel, the Bielskis learned that creation of an Employee Stock Option Plan [ESOP] within a new corporation would render any assets held for employees by the ESOP "creditor proof": i.e., free of any claim by the bank for the debt Funding owed to the bank.[1]

The plan to establish an ESOP within a new corporation began to take shape as of June 18, 2002, when Factors *LLC* was dissolved and Factors *Inc.* was incorporated.

As envisioned, the shares held by the ESOP were to be owned jointly by: 1) Jeffrey and Thomas, who would share ownership of 79% of the company's stock; 2) the company's two other

---

[1] To the extent that testimony by the Bielskis tried to deflect the otherwise persuasive evidence that they wanted to evade the obligation to repay the funds the bank had provided to Funding, I find that testimony not worthy of belief. I have no doubt that Factors was created with at least three inter-related purposes in mind – namely, to: 1) keep the Bielskis in the factoring business; 2) get Perry's money into the business so that it could keep going; and 3) have the business relieved of Funding's debt to the bank.

None of these objectives could be accomplished unless all were achieved. If there were no factoring business, Perry wouldn't provide any funds; if funds weren't forthcoming from elsewhere than the bank, the business could not continue; and Perry wouldn't provide funds unless the business was unencumbered by Funding's debt. Creation of the new entity – Factors – was the way everything could be accomplished. Doing so, of course, breached the Bielskis' obligation under the Loan Agreement to repay the bank. That does not appear to have troubled the Bielskis or Perry; indeed, that was among the Bielskis' purposes when they created Factors.

employees, who would have 11% of the shares; and 3) the company's attorney, who was to receive 10% of the shares. No stock in Factors in these or any other percentages was, however, ever issued.

Nor does the ESOP appear to have been implemented. There is no evidence that the Bielskis shared any profits generated by Factors with anyone else.

The Bielskis' efforts, which stalled when no Factors stock was issued, to manipulate the corporate structure of their business, had no meaningful effect on its operations. Jeffrey and Thomas continued to perform the same work that they had been doing for several years, their two other employees likewise continued to do the same jobs, both Funding and Factors were located in the same premises, and both shared the same phone and fax lines.

There were, to be sure, some differences between Funding and Factors: there were separate business records, files, computers, and checking accounts.

As time passed, there was, as well, a division of the company's principal asset: its accounts receivable. During the Summer and Fall of 2002, the Bielskis caused Funding to transfer its collectible accounts receivable to Factors, while having Funding retain invoices that, at least during the period of the inter-company transfers, had, or appeared at the time to have, no meaningful value.

In addition, at one point, Factors sold to Funding invoices of marginal, if any, value. In the meantime, the Bielskis conducted the affairs of both companies in a way that, in essence, looted Funding of cash that had come to it from Factors when Factors acquired Funding's collectible invoices. To the extent that Funding generated cash, Thomas and Jeffrey used the money to underwrite the expenses of running the overall factoring business and to compensate themselves. The Bielskis otherwise spent this money as they saw fit. As a result, money that should have gone

to the bank under the Loan Agreement went, for the most part, elsewhere, and it did so at the Bielskis' direction and for their benefit.

As noted at the outset of this opinion, the issues in this case are: 1) whether the Bielskis' actions caused Factors to acquire "all, or substantially all" of the assets of Funding; and 2) if so, whether Factors is a "successor corporation" to Funding, so that Factors acquired Funding's debt to the bank in addition to Funding's assets. If Factors is a successor corporation, its assets are encumbered by the bank's security interest under the Loan Agreement, and that security interest takes priority over Perry's unsecured claim against Factors.

### 1. Factors' Acquisition of Funding's Assets

Normally, a company that acquires the assets of a second company does not inherit the liabilities of the second company. *See, e.g., Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 346 (1993) (citations omitted) ("The well-recognized general rule of successor liability provides that the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation.").

If, however, Factors acquired "all or substantially all" of Funding's assets, Factors may be liable under *Welco* for Funding's debts: "A corporation that purchases the assets of another is not liable for the contractual liabilities of its predecessor unless . . .; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." 67 Ohio St. 3d at 347 (citation omitted).[2]

---

[2]

I agree with the bank's contention that Ohio law does not require a finding that the acquiring company acquired *all* the assets of the other company. What matters is that all or *substantially* all the assets were acquired. Thus, in *Welco*, some assets, including substantial cash, remained in the possession of the original company. The court nonetheless considered whether the acquiring company was merely a continuation of the original company. *See* 67 Ohio St. 3d at 345. *Accord*

I conclude that, as the bank contends, Factors acquired substantially all the assets of Funding, even though, when viewed on a superficial basis, it may appear that considerable assets remained in Funding after the Bielskis transferred accounts receivable from Funding to Factors.

To succeed, a factoring business depends, ultimately, on the credit-worthiness of the debtor entities obligated to pay the invoices purchased at a discount by the factor from the factor's customers. The principal assets of a factor are, therefore, the invoices that it purchases. If those invoices are worthless, the factor will have assets, in the form of invoices, in name only.

That, in the final analysis, is what happened to Funding in this case: by the time the Bielskis were done, the "assets" left in Funding were such in name only. On paper, and even on the ledger, they may have looked like something of value; in hand, they had no substantial worth.

The fuel for any factoring operation is funds to purchase a steady flow of invoices. As of May 31, 2002, Funding was not only unable to get more money from the bank, but was also insolvent.[3] That Funding's liabilities [the primary liability being its indebtedness to the bank]

---

*Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 503 (6th Cir. 2005) (noting that acquiring company had obtained "substantially all" the assets.); *see also Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991) (applying Oklahoma law) ("[A] prerequisite for the imposition of liability against a corporation as a mere continuation of a predecessor is a sale or transfer of all, or substantially all, the assets of the latter to the former."); *Howell v. Atlantic-Meeco, Inc.*, 2002 WL 857685, at *2 (Ohio App.) (noting that "the successor liability test in Oklahoma is substantially the same as Ohio's *Flaugher/Welco* test").

[3]

In reaching my determination of the financial status of Funding [i.e., that it was insolvent as of and after May 31, 2002], I have determined that the bank's testimony on this issue, and that of its expert witness, Howard Klein, is more probative and persuasive than that offered by Perry. According to Klein, the bank's expert, approximately $2 million (face value) of the invoices was not collectible.

7

exceeded its assets [principally invoices in its hands] was due in substantial part to the fact that many of the invoices were not collectible.[4]

Two months before, on March 28, 2002, help – in the form of a check from Perry for $50,000 – started to arrive. That check, which was deposited in Funding's operating account, was the first in a series of cash infusions from Perry. Over the next several months, he contributed $1,021,507 to the factoring business.[5]

Once Factors was established, the Bielskis caused Funding to transfer much of Funding's stock of invoices to Factors. These transfers began on June 17, 2002, and continued until the end of that year. The result was to provide Factors with generally collectible [or "good"] invoices, and leave Funding with invoices that were, or showed every indication of being, uncollectible [or "bad"].

The methods by which the Bielskis accomplished the transfer of assets and what they did thereafter were varied, audacious, and remarkable.

First, they would periodically get money from Perry. They then used those funds to purchase "good" invoices from Funding.

Next, they took the funds they had paid to Funding to pay, *inter alia*, Factors' operating expenses.[6] Thereby, they left Funding with neither a supply of "good" invoices nor the wherewithal,

---

[4]

According to the bank's expert, the uncollectible invoices, as of May 31, 2002, were: IGM Corp., Lakes Mold, Natures Ground Care, Nautica Coast Industries, R&J Sheet Metal, SOH, Winstead, AFC, Sylvania Ultrasound, Aim Polyurea, Lyns, and some of the invoices from Unique Staffng.

[5]

The parties spent considerable time arguing whether Perry's subsequent contributions were intended for Funding or for Factors. Because I find that Factors is liable for Funding's debt to the bank, it is not necessary to resolve this dispute, as to which the evidence is conflicting. What matters is what happened to the money after it came into the Bielskis' hands.

[6]

Payment of the funds, or some significant portion of those funds, into the lockbox, as required by

in the form of cash received for the "sale" of the invoices to Factors, with which to purchase more invoices.

From time to time the Bielskis used other means to deplete Funding in favor of Factors – and, ultimately, in favor of themselves. Thus, on October 17, 2002, Funding received more than $70,000 on invoices from Unique Staffing, which the Bielskis had left with Funding. When that money arrived, Jeffrey did not deposit it into Funding's account [much less the lockbox], but into Factors' operating account at Key Bank.

Thereafter, Factors used that money, in part, to purchase from Funding other possibly collectible accounts. Money that should have gone to Funding [or, actually, to the bank's lockbox] was used, in other words, to obtain an additional portion of Funding's then-remaining assets.

Not content with already having Factors benefit twice from the $70,000 from Unique Staffing, the Bielskis recycled that money one more time for Factors' benefit. That was accomplished by having Funding use those funds to pay, in part, for invoices purchased for about $350,000 from Factors. These invoices, originally obtained from Horizon, were largely, if not entirely, fraudulent, and were thus, for all intents and purposes, at least so far as the Bielskis were concerned, close to worthless.[7]

---

the Loan Agreement, to pay down Funding's debt was not, of course, among the uses to which the Bielskis put the monies that passed through Funding and back to them via Factors.

[7] The Horizon invoices had originated with General Motors, and represented payments owed by GM for painting services provided to it by Horizon. The problem was that the invoices were fakes, Horizon having otherwise disposed of the real invoices for its own benefit.

To recapitulate this portion of the Bielskis' treatment of Funding: 1) Funding was to get $70,000 from invoices that had been left with it, but Jeffrey had the money diverted to Factors' bank account; 2) Factors used that money to buy good invoices from Funding; 3) the Bielskis had Funding give that money back to Factors as part of Funding's purchase of fake Horizon invoices.

Along the way, the Bielskis caused Factors to acquire and receive payment on new invoices being generated by its customers, who formerly were Funding's customers. Customer retention, according to Thomas's trial testimony, was an important aspect of the factoring business. Indeed, one of Thomas's principal responsibilities was to try to generate new customers from whom invoices could be obtained. Thus, Factors received not only the present value of the invoices obtained from Funding, but also the expectancy of future invoices.

As a result of the transactions between Factors and Funding during the second half of 2002, Funding was left with few, if any, invoices of value. The customers that had generated the collectible invoices transferred to Factors were no longer providing invoices to Funding. Funding had not generated any new accounts.

The best indication of the circumstances at the end of 2002 appears, perhaps, in year-end notations by the Bielskis' accountants: some accounts receivable "were left on Funding's records to collect out . . . . The accounts that are old and may be difficult to collect were left on Funding's records." With regard to accounts in Factors' hands, the accountants commented, "Per client all [Factors] receivables are considered collectible." That stock of invoices had either come from Funding, or was generated from customers whose accounts had gone from Funding to Factors.

This is not to say that Funding had no accounts or invoices whatsoever. By year-end 2002, Funding had twenty-one customers on its books. Jeffrey testified, however, that of those twenty-one accounts, only three were "active": Drayton Drayton & Lamar [Drayton], Horizon, and Natures

---

Result: 1) Factors has good invoices plus $70,000 cash [plus the balance of the $350 thousand paid *in toto* by Funding for the fake invoices]; 2) Funding has fake Horizon invoices.

10

Ground Care. No invoices had been obtained from the other eighteen customers within the preceding six months.[8]

To describe those accounts as "active" [at least in the sense that they represented a fair prospect of generating money for Funding] is both optimistic and misleading. Drayton, then the largest customer on Funding's books, had no invoices to support the work it claimed it had performed for the United States government. The Horizon account consisted in large part of the fake invoices purchased by Funding for $350,000 and monies diverted from Funding by Horizon's owner [who had originally submitted the fake invoices]. There is no evidence in the record that, as of early 2003, the Natures Grounds account was any more collectible than either the Drayton or Horizon accounts.

I find that by early 2003, at the latest, Funding was defunct. Six months earlier, as a result of its inability to secure additional financing, Funding was without a source of its life's blood as a factor. By transferring any viable accounts to Factors, which was relatively flush from periodic infusions of Perry's cash, the Bielskis leeched away what vitality remained in Funding. Then, by diverting invoices from Funding's existing customers to Factors, the Bielskis cut off Funding's life support.

---

[8] Klein, the bank's expert, testified that, as of December 31, 2002, approximately $1.3 million of the invoices from the eighteen other accounts was uncollectible debt and should have been written off against nearly the same amount of gross receivables. Klein also testified that $726,000 of Horizon's $1.1 million of total invoices was not collectible. As of the end of 2002, Funding had $51,000 in total invoices on its books, of which Klein stated $33,000 was uncollectible. I find that this testimony accurately summarizes the status of the accounts on Funding's books as of the end of 2002.

What was left behind in Funding – eighteen uncollectible accounts, two accounts whose invoices were either lacking or fake, and another account without any apparent value – offered no hope of revival.

It is immaterial that it took the Bielskis somewhat more than six months to push Funding from the debilitation of insolvency into moribundity. Had they done what they did in a few hours or days, instead of taking, as they did, several months, the outcome would not have been different.

In response to the bank's contention that Factors acquired substantially all the assets of Funding, Perry asserts that the bank's subsequent efforts to collect on the accounts left in Funding shows that the assets left behind were really quite substantial.

In support of this contention, Perry relies principally on the fact that, after the bank brought suit to have Funding placed in receivership, its state-court appointed receiver, Mark Dottore, has vigorously sought to collect on both the Drayton and Horizon accounts. As a result, he has, or in due course will have obtained, $2 million from those two sources, each of which had perpetrated frauds on Funding.

There are several flaws in Perry's reliance on Dottore's accomplishments. First, the $2 million that the bank will realize from these efforts has come at the expenditure by it of more than that amount in fees and costs. That hardly shows that accounts that the Bielskis clearly viewed as worthless were, in fact, "assets," as that term is commonly understood. For whatever reason [which was not made clear at trial], the bank has undertaken to throw good money after bad. The fact that it has been unable to break even after doing so is not a fact that is helpful to Perry.

Second, it is clear that, unlike the bank, the Bielskis did not have the resources to make anything like the collection effort the bank has made. Funding was broke in May, 2002. It was worse

12

off in December, 2002. The record lends no support to any suggestion that these accounts, in the hands of the Bielskis, were worth anything. There is no reason, moreover, to believe that Perry would have funded an effort to collect on these accounts.

Third, the fact that the Bielskis ascribed no value to the accounts remaining in Funding is the fairest measure, under all the circumstances, of the accounts' worth as "assets." Had the Bielskis thought that the remaining accounts had any value, I have no doubt that the Bielskis would have transferred them, along with the "good" accounts, to Factors. The Bielskis were, after all, trying to get their factoring business back on a profitable track. Powered by Perry's money, they had every reason to pull along all the potentially profit-making freight they could find. If they left anything of value or even potential value behind, their ability to succeed, even with Perry's generosity, would be lessened.

The Bielskis abandoned as worthless the accounts left in Funding. That something may later have been generated – and even then, at a loss – is no basis for not taking their assessment as they made it – namely, that the accounts had no value, and thus hardly can be deemed to be placed properly on the asset side of Funding's ledger.

In sum, Factors got whatever there was of value that had been in Funding, and Funding was left with whatever did not have, or did not appear to have, value. That some value may have ultimately – at a very great expense over a period of years – been realized does not alter the essential facts of what happened between Funding and Factors.

I find, accordingly, that substantially all of Funding's assets were transferred to Factors.

### 2. Factors is a Continuation of Funding

As stated by the Sixth Circuit in *Mickowski v. Visi-Trak Worldwide, LLC*, 415 F.3d 501, 509-510 (6th Cir. 2005) (citations omitted) (alterations in original):

> Under Ohio common law, a corporation is not a mere continuation of the corporation whose assets it has purchased, just because it continues to provide the same services. Under a "mere continuation" theory of successor liability, it is not enough to show that the purported successor has "the same physical plant, officers, employees and product line as" the purported predecessor. Rather, "the basis of this [mere continuation] theory is the continuation of the corporate entity, not the business operation, after the transaction," such as when one corporation sells its assets to another corporation with the same people owning both corporations. "[T]he key element in establishing continuation is a common identity of stockholders, directors, and stock.

Thus, under Ohio's "mere continuation" test, I must determine whether "the same people own[ed] both corporations." *See id.* (holding in the alternative that the purchaser of a debtor corporation's assets was not the debtor corporation's successor under Ohio's mere continuation test because the buyer did not share common ownership with the debtor). The Ohio Supreme Court has chosen to adopt a narrow variation of the mere continuation theory to "protect corporations from unassumed liabilities." *See Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St. 3d 60, 64 (1987) (citations omitted)[9]. As a result, a court will be reluctant to impose successor liability where the assets-for-cash transaction took place among strangers at an arm's length and where there is no

---

[9]

The Ohio Supreme Court set forth its test for successor liability in *Flaugher*, a case dealing with successor liability in the products liability context. The Ohio Supreme Court first applied the *Flaugher* test to a predecessor corporation's contractual obligations in *Welco. See Aluminum Line Prods. Co. v. Brad Smith Roofing Co., Inc.*, 109 Ohio App. 3d 246, 263 (1996).

In *Welco*, the Ohio Supreme Court rejected "the expanded mere-continuation theory," which allows a court to impose successor liability where there are significant shared features between the predecessor and the successor corporations. *See Kuempel Serv., Inc. v. Zofko*, 109 Ohio App. 3d 591, 602 (1996). The court indicated that the presence of significant shared features (e.g., physical location, officers, employees, and products) is "relevant only to the expanded mere-continuation and product line theories of successor liability," *Welco*, 67 Ohio St. 3d at 350; *see id.*

evidence that the transaction took place to escape liabilities. *See, e.g., Aluminum Line Prods. Co.*, 109 Ohio App. 3d at 266.

I conclude that, from the standpoint of who was in control and in charge, the same individuals – the Bielskis – owned both Funding and Factors. This pragmatic, common-sense, and clear-eyed perspective has to be adopted because of one simple fact: Factors' stock was never issued either to any shareholders or to the ESOP, which was to have held Factors' stock for the benefit of Factors' employees.

When the ESOP was formed, Thomas and Jeffrey anticipated that between them, they would own 79% of Factors' stock, with the remainder owned by two employees and the firm's attorney. Sharing ownership was necessary to establish an ESOP within Factors, and establishing an ESOP was necessary to make the shares in the reformulated operation, as an ESOP, creditor-proof, thereby leaving Funding with the debt to the bank, and the bank with an empty lockbox.

While the court in *Welco* recognized that a sale of a corporation's assets is an important tool in raising liquid capital to pay off corporate debts, 67 Ohio St. 3d at 348-49, the evidence overwhelmingly establishes that, beginning in the Spring of 2002, the Bielskis did not intend to pay back the bank. It is irrefutable that the primary and overriding intent in forming Factors was to circumvent Funding's debt obligations.[10] Doing so was essential if Perry and his money were to be

---

10

Because the goal of creating a "mere continuation" of the predecessor corporation is to evade the predecessor's debt obligations, "inadequacy of consideration is one of the indicia of mere continuation," *Welco*, 67 Ohio St. 3d at 350 (citation omitted). Because most, if not all, of the money received by Funding from Factors in consideration for the invoices was used to benefit the Bielskis and to pay Factors' operating expenses, I conclude that Funding received inadequate consideration for the accounts "sold" to Factors. This fact, together with my finding that the ownership of Funding and Factors remained the same, reinforces my decision to impose successor liability on Factors.

15

available to continue the business. Perry was not about to provide money to Funding in the face of the bank's priority position. But he wanted the 20% return that the Bielskis were willing to pay. And the Bielskis needed his money if they were to keep things going.[11]

This neat and tidy ESOP-based scheme would have worked but for one problem: Factors' shares were never issued and were therefore never transferred to the ESOP.[12] Thus, to the extent that anything was owned, in the sense of holding stock, Jeffrey, who owned 100% of Funding's stock, was the only one with an ownership interest – even though another corporation had been formed in anticipation of a transfer of the ownership of the business.[13]

---

[11]

Those closest to the business knew that nothing was changing, even if a new corporate form had been adopted, along with a new company name. On June 21, 2003, Jeffrey told the Michigan Secretary of State that Funding had changed its name to Factors. Employee Sandy Rosinski used the word "switched" (not "sold" or "purchased") to describe the movement of the invoices from Funding to Factors. The Bielskis' outside accountant, Jack Hagmeyer, chose to use the phrase, "transfer invoices . . . from Funding to Factors" when preparing the pertinent accounting entry. His firm twice billed Factors for discussion of issues relating to the "transfer" from Funding to Factors. The Bielskis were, moreover, contemplating a transfer of all, or almost all, of Funding's tangible assets, such as furniture, cars, etc., to Factors.

While the bank may have been fooled as to what was transpiring, the Bielskis knew full well just what was going on and why and how it was being done.

[12]

Perry attributes the failure to have transferred the stock to the intervention of the Factors bankruptcy. On review of the record, I find that it is more likely than not that drawbacks, including the expenses of setting up and running an ESOP, as recited by the Bielskis' accountant, caused the delay in issuing the stock to the ESOP. Given the fact that the Bielskis were "maxed out" with the bank, and that they were running Factors, to a considerable extent, with assets and monies taken from Funding, their reluctance and failure to pay those expenses is understandable.

[13]

*Cf. In re Parton*, 137 B.R. 902, 905 (Bankr. S.D. Ohio 1991) (holding that piercing of corporate veil was appropriate where corporation, *inter alia*, failed to issue stock). I find that Factors' failure to issue stock renders Factors (and its ESOP) a sham – ownership in and control over the business, including Factors, remained with Jeffrey at all times.

And, of course, nothing else changed, in terms of who was in charge and control: Jeffrey and Thomas. The business was clearly theirs; though in the form of a corporation, it was conducted, for all intents and purposes, as a partnership. There is no indication that, as to them, either one was the "boss." It was a family business. Factors was merely a "reincarnation" of its predecessor – the old corporation in a "new hat."  *See, e.g., Kuempel Serv., Inc. v. Zofko*, 109 Ohio App. 3d 591, 602 (1996) (citations omitted). It is, moreover, apparent that the Bielskis alone continued to share in the profits, just as they had been doing: there is no evidence that the other putative shareholder-owners ever received a nickel of Factors' profits.

This view of the reality of ownership and its most significant attribute – control over every aspect of the enterprise – is underscored by the fact that the transformation of the company in the mid-90s from a sole proprietorship in Thomas's hands into a corporation wholly owned by Jeffrey happened because Thomas could not secure credit in his own name. While the evidence does not illuminate the reasons that that was so, the inference is fair and clear: father and son decided to adopt the corporate form to avoid the consequences of the father's lack of creditworthiness.

The record in this case, taken as a whole, shows that from the time Jeffrey came into the company, he and his father ran it, controlled it, and, in the broadest sense of the word, owned it. That never changed, and remains true, even if they intended to change their corporate form as one would discard a worn shoes for a new pair; indeed, when the LLC didn't fit, they thought they'd give the ESOP a try.

Both *de facto* and *de jure* the ownership of Funding and Factors was the same:  the predecessor, Funding, continued as a business entity through the incorporation of its successor, Factors. *See, e.g., Kuempel*, 109 Ohio App. 3d at 602 (citations omitted). Accordingly, I conclude

that Factors was a "mere continuation" of Funding. Consequently, the debt to the bank must follow the transfer of assets from Funding to Factors.[14]

### 3. The Bielskis Formed Factors in a Fraudulent Attempt to Escape Liability

Even if Factors is not a "mere continuation" of Funding, I hold in the alternative that the Funding-Factors transaction meets the fourth exception to the general rule of successor nonliability: the Bielskis formed Factors with a fraudulent intent to escape Funding's liability to the bank. *See, e.g., Pottschmidt v. Klosterman*, 2006 WL 3825206, at *7 (Ohio App.) (holding that evidence supported imposition of successor liability based on "fraudulent transaction" exception where new corporation was formed one month after third party sued predecessor corporation, predecessor's sole shareholder acknowledged only that new corporation was formed to escape a liability distinct from third party's lawsuit, and sole shareholder's accountant-attorney testified that accountant-attorney had discussed lawsuit and damages with sole shareholder before new corporation was formed).

In *Welco*, the Ohio Supreme Court identified inadequate consideration and lack of good faith as two indicia of fraud for the purposes of imposing successor liability. *See* 67 Ohio St. 3d at 349

---

[14] My conclusion is consistent with the equitable principles governing successor liability. *See Kemper v. Saline Lectronics*, 366 F. Supp. 2d 550, 554 (N.D. Ohio 2005) ("[S]uccessor liability is an equitable doctrine and 'equity is loath to elevate the form of the transfer over its substance'" (citation omitted)); *Ohio Bureau of Workers' Comp. v. Widenmeyer Elec. Co.*, 72 Ohio App. 3d 100, 104 (1991) (noting in a pre-*Welco* decision that the "Ohio Supreme Court has imposed successor liability for corporate debts other than product liability under general principles of equity") (citing *Auglaize Box Board Co. v. Hinton*, 100 Ohio St. 505, 518 (1919)). Equity prohibits the Bielskis' attempt to "retain the benefits of their ownership interest while leaving creditors without a remedy," *Cargo Partner AG v. Albatrans Inc*., 207 F. Supp. 2d 86, 95 (S.D.N.Y. 2002) (citation and internal quotation marks omitted).

(citing *Turner v. Bituminous Cas. Co.,* 244 N.W.2d 873, 887 (Mich. 1976)). Both indicia of fraud are present here.[15]

Because most, if not all, of the money received by Funding from Factors in consideration of Funding's invoices was used to benefit the Bielskis and to pay Factors' operating expenses, Funding

---

[15]

Ohio courts have not explicitly stated that the elements required to prove a fraudulent transaction exception under successor liability law are generally the same as those required to prove a fraudulent transfer under Ohio's Uniform Fraudulent Transfer Act, O.R.C. §§ 1336.01-.12, but Ohio courts have conflated the standards of these two creditor remedies. *See, e.g., Seavert v. Ferraro*, 2000 WL 1300154, at *4 (Ohio App.); *Seibel v. Crown Cork & Seal Co., Inc.*, 1986 WL 6817, at *2 (Ohio App.) (citation omitted) (describing the fourth exception to the general rule of nonliability as "actual fraud [being] present in the transaction").

Ohio law gives no indication, however, that, as Perry and the trustee suggest, the standard for establishing a fraudulent transaction exception is substantially more rigorous than that required to establish a fraudulent transfer. *See, e.g., JSB Industries, Inc. v. Nexus Payroll Servs., Inc.*, 463 F. Supp. 2d 103, 110 (D. Mass. 2006):

> The fourth exception to the traditional rule of nonliability arises where a transaction is entered into fraudulently to evade liability for debts. For example, the fraud exception has been used to impose liability on a buyer where the consideration given for the assets was fictitious or inadequate. This exception essentially amounts to an application of the general rule against fraudulent conveyances and was created to prevent entities from changing their corporate form to escape liability.

The primary difference between the two remedies is that the fraudulent transaction exception, unlike the avoidance of a fraudulent transfer, allows a creditor of the *predecessor* corporation to sue the purported *successor* corporation directly. In contrast, in a fraudulent transfer action, a creditor of the predecessor can generally only sue the predecessor to unwind an unfair transfer of assets to the successor corporation. *See APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 629-30 (7th Cir. 2002); *In re Revco D.S., Inc.*, 118 B.R. 468, 474-75 (Bankr. N.D. Ohio 1990) (noting that "creditor" status is necessary to give one standing to pursue an Ohio fraudulent conveyance action).

Although the court in *Welco* refers only to two "indicia" of fraud, 67 Ohio St. 3d at 349, I note that additional "badges of fraud" enumerated in O.R.C. § 1336.04(B) are present here: Funding transferred its accounts to "insiders," the transfers were not disclosed to the bank, the transfers consisted of substantially all of Funding's assets, Funding did not receive reasonably equivalent value for the accounts receivable it sold to Factors, and the transfers occurred when Funding was insolvent.

19

received inadequate consideration for the accounts it "sold" to Factors. *See supra* note 10. The transaction depleted Funding of its "good" invoices, leaving Funding with insufficient assets to repay the bank. *See Crislip v. Twentieth Century Heating and Ventilating Co.*, 1989 WL 11795, at *4 (Ohio App.) (citation omitted) ("[T]he question of whether a transfer of assets was fraudulent depends upon whether the consideration given by the transferee was adequate and whether the transaction left the transferor with sufficient assets to pay the claims of its creditors.").

Second, the evidence clearly establishes that Factors was formed to evade Funding's debt obligations. After looting Funding's invoices and cash for the benefit of Factors, the Bielskis intended to create an ESOP within Factors to protect Factors' stock from attachment by creditors. *See* discussion *supra* Parts 1-2. As a result, the Funding-Factors transaction is marked by actual fraud and falls within the fraudulent transaction exception to the general rule of successor nonliability.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT declaratory judgment be, and the same hereby is entered in favor of the RFC Banking Company.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge